**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re:<br><br>HEALTH DIAGNOSTIC LABORATORY, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 15-32919 (KRH)<br><br>(Jointly Administered) |
| HEALTH DIAGNOSTIC LABORATORY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TRUE HEALTH DIAGNOSTICS, LLC, and JEFFREY P. "BOOMER" CORNWELL,<br><br>Defendants. | Adv. Pro. No. 16-03011 (KRH) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION OF PLAINTIFF FOR
ENTRY OF AN ORDER EXPEDITING CONSIDERATION OF, AND SHORTENING
THE NOTICE PERIOD APPLICABLE TO, MOTION FOR A TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND ORDER TO SHOW
CAUSE FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY,
<u>AND MEMORANDUM IN SUPPORT</u>**

Defendants True Health Diagnostics, LLC ("True Health") and Jeffery P. "Boomer"

Cornwell ("Cornwell" and together with True Health, "Defendants"), by its undersigned counsel,

hereby files their response in opposition to Motion of Plaintiff for Entry of an Order Expediting

Consideration of, and Shortening the Notice Period Applicable to, Motion for a Temporary

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Health Diagnostic Laboratory, Inc. (0119), Central Medical Laboratory, LLC (2728) and Integrated Health Leaders, LLC (2434).

Restraining Order, Preliminary Injunction, and Order to Show Cause for Willful Violations of

the Automatic Stay, and Memorandum in Support (the "Motion to Expedite") and in support

thereof, submits as follows:

## PRELIMINARY STATEMENT

Plaintiff's adversary proceeding and motion for immediate injunctive relief arise from a

pending contract dispute between Plaintiff and True Health regarding the correct interpretation of

certain sections of the Asset Purchase Agreement for the Section 363 sale of substantially all

Plaintiff's assets to True Health.  It is not, as Plaintiff's suggest in their pleadings, some abrupt

action taken by True Health that violates the automatic stay or justifies immediate injunctive

relief, much less an expedited hearing for a temporary restraining order on less than 48-hours'

notice.  Indeed, after True Health expressed its serious concerns regarding Plaintiff's improper

collection efforts and tortious interference with True Health's client relationships more than one

month ago, Plaintiff **_voluntarily agreed_** to discontinue their wrongful collection actions (which

agreement has continued for more than three weeks), while the parties attempted to resolve the

issue without court involvement.  Plaintiff cannot now be heard to complain that it will be

irreparably harmed from engaging in conduct it voluntarily agreed to discontinue and has

discontinued for weeks.  Nor can it justify an expedited hearing on its request for a temporary

restraining order on less than 48-hours' notice.

It now appears that instead of engaging in good faith negotiations with True Health,

Plaintiff was instead preparing to ambush Defendants with an improvidently filed adversary

complaint and motion for immediate injunctive relief to attempt to gain a tactical litigation

advantage.  This improper motive is underscored by Plaintiff's counsel's failure to even attempt

to contact Defendants' counsel to engage in a _bona fide_ effort to resolve this matter without a

- 2 -

hearing, despite Plaintiff's Rule 9013-1(N) certification to the contrary.  As explained in detail

below, the Court should deny the Motion to Expedite because (1) Plaintiff fails to demonstrate

irreparable harm with respect to its ability to pursue disputed collection actions that it voluntarily

agreed to discontinue (and has discontinued) for nearly one month; (2) Plaintiff fails to articulate

how Defendants' attempts to protect themselves against post-petition torts violate the automatic

stay or justify an immediate TRO hearing; (3) Plaintiff fails to explain why money damages

would not be a sufficient remedy; (4) Plaintiff does not allege how True Health has failed or

refused to provide information to Plaintiff or why such failure necessitates an immediate TRO

hearing; (5) Plaintiff falsely certified that it made a *bona fide* effort to resolve the Motion to

Expedite; and (6) Plaintiff improperly noticed the hearing for a temporary restraining order.

## BACKGROUND FACTS

On September 17, 2015, the Court entered an order approving the Asset Purchase

Agreement entered into between True Health, as buyer, and Plaintiff and Integrated Health

Leaders, LLC, as sellers (the "APA"), authorizing the sale of substantially all of Plaintiff's assets

to True Health free and clear of all claims (the "Sale") and granting related relief.  *See* Docket

No. 512.  On September 29, 2015, the parties closed the Sale, and True Health purchased the

majority of Debtors' operational assets and hired nearly all of Debtors' workforce, totaling more

than 375 employees.  The Sale was hailed by the Court and all parties as a tremendous success

under very difficult circumstances.  After the Sale closed, True Health worked collaboratively

with Plaintiff and its professionals to collect current accounts receivables purchased by True

Health, and used the proceeds to repay the full principal amount of the $10 million seller note

plus over $2 million of interest and additional principal well before the January 31, 2016

maturity date, providing additional, unexpected proceeds to Plaintiff's estate.

Shortly after these proceeds were paid over to Plaintiff's estate, True Health began receiving disturbing reports from its clients that former patients of Plaintiff (and current patients of True Health) were receiving aggressive and harassing collection notices from a Florida collection agency called Accelerated Receivables Management ("ARM") for services performed many years ago that were never billed to these patients and written by Plaintiff pursuant to their express billing policy. Upon further investigation into this issue, True Health received documentation of abusive and unlawful collection actions committed by ARM against True Health patients, including pursuing collections in jurisdictions that ARM was not authorized to collect debts and making false representations that ARM was pursuing these collections on behalf of the Department of Justice and True Health (neither of which is true). As a result of these improper collection actions committed by ARM on behalf of Plaintiff, current clients of True Health threatened to discontinue—and in many cases have discontinued—all future business with True Health, thereby jeopardizing the viability of True Health's business and threatening to undo the success achieved as a result of the Sale that closed just a few short months ago.

Immediately upon learning of these collection actions instituted by ARM, True Health contacted Plaintiff to inquire into the basis of these collections and advise Plaintiff regarding the reports of ARM's unlawful collection practices. In response to these inquiries, Plaintiff confirmed with True Health that they had authorized ARM to initiate collection actions directly against patients for services allegedly provided as far back to 2009 despite the fact that, among other things, Plaintiff had never billed patients for these alleged receivables, Plaintiff had expressly waived the right to pursue these types of collections directly against patients pursuant to their contracts with physician offices and patients, and Plaintiff's published billing policies,

Plaintiff had long ago written off these alleged receivables and obtained certain tax benefits from the write-offs, and Plaintiff never disclosed these written-off debts as potential assets during the Sale process that would be retained by the estate as assets under Section 2.2 of the APA, nor were these alleged assets expressly carved out as an Excluded Asset in Schedule 2.2(m) of the APA. Plaintiff's counsel refused to take any action to temporarily forbear from these collection actions or inquire into the numerous complaints of improper collection practices by ARM.

As a result, on January 5, 2016, True Health sent a cease and desist letter to ARM demanding that it immediately cease and desist from tortuously interfering with True Health's patient relationships. That same day, True Health sent a cease and desist letter to Plaintiff demanding that the estate immediately instruct ARM to cease and desist these improper collection activities. True and correct copies of the cease and desist letters are attached hereto as Exhibit A.

Shortly after sending the cease and desist letters, True Health and Plaintiff engaged in discussions in an attempt to resolve the issue without court involvement. As a result of those discussions, True Health made a substantial offer of more than $1 million to resolve the parties' disputes. Plaintiff represented that they would consider it in good faith, but needed additional time to review information to better evaluate the offer.

On January 8, 2016, counsel for True Health and Plaintiff participated in a telephone conference during which Plaintiff's counsel voluntarily agreed that the estate would instruct ARM to discontinue any collection actions with respect to the most harmful and egregious collection actions directed against patients who never received a bill from Plaintiff or a check from their insurance carrier—the "third batch" of collection information Plaintiff had previously sent to ARM for collection (the "Patient Responsibility Collections"). The following business

day, on Monday, January 11, 2016, Plaintiff's counsel confirmed that conversation and represented that "[t]he Debtors have asked that ARM not take further collection steps at this time with respect to a third batch previously sent to ARM." Plaintiff's counsel also requested that True Health provide Plaintiffs with additional information relating to Plaintiff's collection efforts with respect to the first two batches, which True Health provided to Plaintiff just a few days later. A true and correct copy of the email exchange reflecting these conversations is attached hereto as Exhibit B.

The next correspondence True Health received from Plaintiff was an email from Plaintiff's counsel on the afternoon of February 1, 2016, stating that Plaintiff was rejecting True Health's offer (without any reason or counteroffer) and was instead pursuing litigation against Defendants by filing its adversary complaint, motion for injunctive relief, and the Motion to Expedite. *See* Docket No. 802. It now appears that Plaintiff was not negotiating with True Health in good faith, but rather misleading True Health in an attempt to gain an improper litigation advantage. Plaintiff's deceptive tactics should not be sanctioned by the Court and undermine Plaintiff's request for the expedited relief it seeks in the Motion to Expedite.

## LEGAL ARGUMENT

### A.   Plaintiff Fails to Demonstrate Irreparable Harm Requiring An Immediate TRO Hearing

The first basis for Plaintiff's request for an immediate hearing on its motion for a temporary restraining order (the "TRO Hearing") is that it will suffer irreparable harm if Defendants are not immediately enjoined because "HDL and its estate stand to suffer the loss of significant amounts in uncollected Excluded Receivables." Mot. to Expedite at ¶ 14. That justification completely overlooks the fact that Plaintiff already voluntarily agreed, more than three weeks ago, to discontinue the collection actions with respect to the Patient Responsibility

Collections at issue in its motion.  Consequently, there can be no risk of irreparable harm with

respect to collection activities that Plaintiff is not currently pursuing.  Defendants have not

interfered, and have no intent to interfere, with any other lawful and authorized collection actions

with respect other alleged accounts receivable owned by Plaintiff.  Furthermore, Plaintiff fails to

identify what ongoing and continuing actions Defendants are allegedly taking that might possibly

interfere with the ARM Agreement and so-called Patient Obligations.  The only evidence

submitted in support of Plaintiff's complaint and motion are correspondence from nearly a

month ago, all of which pre-date Plaintiff's agreement to discontinue  the Patient Responsibility

Collections.  Plaintiff makes no allegations of any ongoing or continuing conduct committed by

Defendants after Plaintiff's agreement to stop the Patient Responsibility Collections that would

justify an immediate TRO Hearing.

      The second basis for Plaintiff's request is that if Defendants are not required to show

cause as to why they should not be held in contempt for violating the automatic stay, then such

stay violations "likely will continue and HDL's estate and creditors will suffer irreparable harm."

Mot. to Expedite at ¶ 14.  Plaintiff's argument misconstrues the application of the automatic stay

to the claims at issue in this case.  It is well established that the automatic stay "is limited to

actions that could have been instituted before the petition was filed or that is based on claims that

arose before the petition was filed.  It does not include actions arising post-petition." *Bellini*

*Imports, Ltd. v. Mason & Dixon Lines, Inc.*, 944 F.2d 199, 310 (4th Cir. 1991).  Here, True

Health's attempts to prevent Plaintiff and ARM's tortious interference with True Health's clients

and business relationships based on a flawed interpretation of the APA all concern post-petition

conduct that is not subject to the automatic stay.  Plaintiff offers no evidence True Health has

ever attempted to collect or obtain possession of any alleged asset of the bankruptcy estate;

- 7 -

rather, True Health attempted to protect itself against post-petition tortious interference with its

business relationships.  Accordingly, the automatic stay does not apply and there is no risk of any

continuing stay violations that would rise to the level of irreparable harm.  Even if there was a

potential stay violation, and such violation was ongoing—neither of which are true—Plaintiff

fails to articulate how the "HDL's estate and creditors will suffer irreparable harm."  Mot. to

Expedite at ¶ 14.  Indeed, none of Plaintiff's pleadings allege any ongoing conduct by True

Health that presents an immediate and irreparable threat of a continuing stay violation or harm to

Plaintiff's estate.

The third and final basis for Plaintiff's request for an immediate TRO Hearing is that

Plaintiff "will suffer substantial injury because HDL will be unable to collect some or all of the

Excluded Receivables and will lose the portion of the collection proceeds it is entitled to receive

from the collection of Purchased Receivables."  Mot. to Expedite at ¶ 14.  As explained above,

Plaintiff already voluntarily agreed more than three weeks ago not to pursue the Patient

Responsibility Collections, so there is no current, immediate threat of irreparable harm.

Moreover, even if there were a risk that Plaintiff might "lose the portion of the collection

proceeds it is entitled to receive from the collection of Purchase Receivables," such loss could be

compensated through an award of money damages.  The Fourth Circuit has recognized that

"[w]here the harm suffered by the moving party may be compensated by an award of money

damages at judgment, courts generally have refused to find that harm irreparable." *Hughes

Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Plaintiff

has failed to allege any "extraordinary circumstances" required to find irreparable harm when

money damages would suffice.  *Id.*

**B.**      **True Health Has Provided Plaintiff with Appropriate Access to Information**

In its pleadings, Plaintiff alleges that True Health has refused to provide Plaintiff with

access to the books and records it acquired as part of the Sale.  *See* Adv. Compl. at ¶¶ 102-03.

Section 2.1(h) of the APA provides that True Health acquired all of Plaintiff's Books and

Records as part of the Sale.  *See* APA § 2.1(h), attached as Exhibit A to Adv. Compl.  Plaintiff

alleges that True Health has refused to provide information relating to Plaintiff with information

concerning the Excluded Receivables in violation of Section 10.3 of the APA.  *See* Adv. Compl.

at ¶ 103.  That section requires True Health to provide Plaintiff with "reasonable access" to its

books and records and expressly excludes any attempts "to interfere unreasonably with the

operation of the business of any party."  APA § 10.3.  Here, Plaintiff fails to make any specific

allegation that it requested information from True Health and True Health failed or refused to

provide that information.  Instead, True Health has timely provided Plaintiff with information it

requested relating to the collection of accounts receivables, as illustrated by Exhibit B.

Accordingly, Plaintiff's unsupported allegations regarding True Health's failure or refusal to

provide Plaintiff with reasonable access to information pursuant to Section 10.3 of the APA rings

hollow and does not support the need for an immediate TRO Hearing.

**C.**      **Plaintiff Did Not Make a *Bona Fide* Effort to Resolve the Scheduling of the TRO Hearing**

Local Rule 9013-1(N) requires a party requesting an expedited hearing to certify, among

other things, that the party "has made a *bona fide* effort to resolve the matter without hearing."

Plaintiff's counsel attached a Rule 9013-1(N) certification to the Motion to Expedite, declaring

that he "made a *bona fide* effort to resolve the matter without hearing."  That declaration is false.

Plaintiff did not even contact True Health before filing the Motion to Expedite, let alone attempt

to resolve the requested relief to expedite the TRO Hearing before filing the Motion to Expedite

and executing the Rule 9013-(N) certification.  For that reason alone, the Motion to Expedite

should be denied.

**D.**      **Plaintiff Improperly Noticed the Hearing on the Motions**

Plaintiff's Notice of Motion and Notice of Hearing filed in connection with the Motion to

Expedite states that "if the Motion to Expedite is granted" then there will be a hearing on

February 3, 2016 at 2:00 p.m. prevailing Eastern Time.  However, the docket entry on the

Court's ECF system reflects that a hearing has been scheduled for February 3, 2016 at 10:00 a.m.

Plaintiff has failed to reconcile this inconsistency or otherwise confirm with Defendants when

the proposed hearing is scheduled to occur.

**E.**      **The Court Should Set a More Reasonable Schedule to Resolve Plaintiff's Request
for Injunctive Relief**

As explained above, Plaintiff has failed to demonstrate the type of immediate and

irreparable harm required to obtain the extraordinary relief of holding a TRO Hearing on less

than 48-hours' notice.  It appears that Plaintiff seeks such an expedited hearing not to protect a

legitimate, immediate interest, but rather to obtain a litigation advantage over Defendants.   This

is particularly true because Plaintiff's alleged irreparable harm relates to collection practices that

it voluntarily agreed to stop more than three weeks ago and is not currently pursuing.  The Court

should not sanction Plaintiff's gamesmanship, which is designed to impart undue prejudice on

Defendants.  Instead, Defendants propose that the Court adopt the objection deadline  of

February 12, 2016 and hearing date of February 16, 2016 originally proposed by Plaintiff for the

preliminary injunction hearing for the TRO Hearing, with the preliminary injunction hearing to

occur two weeks later.  That reasonable proposal continues the proposed TRO Hearing for only

seven business days, provides Defendants with a reasonable opportunity to respond to Plaintiff's

allegations, and will allow the  Court to make more informed decision regarding the propriety of

a temporary restraining order.  Furthermore, there is no prejudice to Plaintiff in adopting this

schedule.

In any event, Defendants' counsel has informed Plaintiff's counsel that it has a conflict

that will prevent him from appearing at hearing in Richmond, Virginia on February 3, 2016.

Accordingly, if the Court is unwilling to adopt the short extension of time proposed above,

Defendants request that a hearing on the Motion to Expedite be at least continued to February 5,

2016.

## CONCLUSION

For the forgoing reasons, the Court should deny the Motion to Expedite.


Dated:  February 2, 2016                  By: */s/ H. Slayton Dabney, Jr.*
                                          Dabney, PLLC
                                          H. Slayton Dabney, Jr. (VSB No. 14145)
                                          303 Grande Court
                                          Richmond, VA 23229
                                          Phone: (646) 549-1181
                                          sdabney@dabneypllc.com

                                          -and-

                                          Eric E. Walker
                                          PERKINS COIE LLP
                                          131 South Dearborn Street, Suite 1700
                                          Chicago, IL  60603-5559
                                          Telephone:  312.324.8400
                                          Facsimile:  312.324.9400

                                          *Attorneys for Defendants*

# **<u>EXHIBIT A</u>**

# PERKINSCOIE

131 South Dearborn Street
Suite 1700
Chicago, IL 60603-5559

T +1.312.324.8400
F +1.312.324.9400
PerkinsCoie.com

January 5, 2016

Eric E. Walker
Partner
EWalker@perkinscoie.com
D. +1.312.324.8659
F. +1.312.324.9659

**VIA FEDERAL EXPRESS OVERNIGHT,
FACSIMILE AND EMAIL**

Fran Landau
Accelerated Receivables Management, Inc.
3740 Beach Boulevard, Suite 307-A
Jacksonville, Florida 32207
Fax: 904-562-5245
fran@cuttingedgecollections.com

Re:    **CEASE AND DESIST - Unauthorized Health Diagnostic Laboratory Collection
Actions**

Dear Ms. Landau:

This law firm represents True Health Diagnostics, LLC ("True Health").  On September 17,
2015, the United States Bankruptcy Court for the Eastern District of Virginia entered an order
approving the sale of substantially all of the assets of Health Diagnostic Laboratory, Inc.
("HDL") to True Health, which sale closed on September 29, 2015.  Pursuant to that sale, True
Health acquired substantially all of the assets of HDL, including certain of its accounts
receivables and all of its books and records, and uses these assets to operate a diagnostic
laboratory business that serves many of the former physicians and patients of HDL.

We have recently learned that Accelerated Receivables Management, Inc. ("ARM") has
initiated unauthorized, aggressive collection actions directly against individual True Health
patients for services performed by HDL years ago that were never billed to these patients and
previously written off by HDL.  For the reasons explained below, ARM's actions are unlawful
and causing immediate and irreparable harm to True Health's ongoing business relationships
with these patients and their physicians.  We therefore demand that you **IMMEDIATELY
CEASE AND DESIST** from all collections efforts against former patients of HDL.

First, the Bankruptcy Court has not authorized the retention of ARM to pursue any collection
action on behalf of the HDL bankruptcy estate, as is required under the Bankruptcy Code.
Please note that HDL's bankruptcy attorneys and the Office of the United States Trustee are
copied on this notice.

Second, ARM has no legal right to collect any outstanding amounts on behalf of HDL directly
from patients.  The HDL billing policy, distributed to physicians and patients, expressly states
that it will not bill or seek payment directly from patients except in limited circumstances.  HDL
never issued an invoice or a bill to these patients and instead expressly assumed the risk of non-
payment.  A copy of these HDL billing policies are enclosed with this letter.  The ARM

Fran Landau
January 5, 2016
Page 2

collection actions directly violate this billing policy and attempt to collect a debt that was never billed and expressly waived by HDL.

Third, ARM is improperly attempting to collect debts using misappropriated and/or inaccurate information. As part of the sale of substantially all of HDL's assets, True Health acquired the books and records of HDL, including all information relating to HDL billing and accounts receivable. True Health has not provided this information to ARM, nor has it authorized anyone else to do so. Accordingly, ARM does not have access to legitimate billing and accounts receivable information to correctly calculate the amounts for these unauthorized collection actions. We have identified numerous inaccuracies in the amounts alleged in the ARM collection notices.

Fourth, ARM is actively making misrepresentations regarding True Health and its relationship to HDL as part of its unauthorized collection activities. These representations include statements that ARM is pursuing these collections on behalf of True Health, that True Health is the new name of HDL, directing patient inquiries into these collection actions to True Health and encouraging patients to solicit account information from True Health, among other improper and inaccurate statements. These misrepresentations have severely and irreparably injured True Health's goodwill and relationship with its patients and physicians. Any attempt to collect a debt using false, deceptive or misleading representations is a violation of the Fair Debt Collection Practices Act, among various other debt collection statutes and regulations. Please note that the Federal Trade Commission, Consumer Financial Protection Bureau and Attorney Generals for Florida and Virginia are copied on this notice.

Fifth, it does not appear that ARM is legally authorized to collect debts in many jurisdictions in which it is pursuing such actions, including Arizona, Arkansas, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, Tennessee, Texas, Utah, West Virginia, Wisconsin, Wyoming and Washington.

We demand that ARM confirm by **no later than 4:00 p.m. Eastern Standard Time on January 7, 2016** that it will immediately cease and desist from any and all collections activities against former HDL patients. True Health expressly reserves all of its rights to seek legal, equitable and other relief against ARM, and anyone facilitating or working in connection with ARM, based on these unlawful actions.

Fran Landau
January 5, 2016
Page 3


Please call me at your earliest opportunity to discuss this matter further.

Very truly yours,

Eric E. Walker

EEW:ah

Enclosures

Cc:     H. Slayten Dabney, Jr., Dabney PLLC (via email)
        Tyler P. Brown, Hunton & Williams LLP (via email)
        Robert B. Van Arsdale, Office of the United States Trustee (via email)
        Richard Kanowitz, Cooley LLP (via email)
        Federal Trade Commission (via Federal Express)
        Consumer Financial Protection Bureau (via Federal Express)
        Office of the Attorney General for the State of Virginia (via Federal Express)
        Office of the Attorney General for the State of Florida (via Federal Express)

![Health Diagnostic Laboratory Inc.]

# Health Diagnostic Laboratory, Inc. (HDL, Inc.) Pricing Overview

- **MEDICARE / MEDICAID**
  - The entire cost of services performed by HDL, Inc. is covered under current Medicare/Medicaid requirements.
- **PPO's, POS & HMO Plans:**
  - HDL, Inc. will accept the amount your insurance company allows for each diagnostic.
  - If it turns out your insurance company does not cover a specific test, HDL, Inc. assumes all the risk.

Below you will find an example of a document that you may receive from your insurance company. This is an explanation of the insurance claim (Explanation of Benefits). IT IS NOT A BILL, so do not send payment when it is received. Read the document carefully as different insurance companies label their documents differently.

**THE BENEFITS SUMMARY OF YOUR CLAIM IS NOT A BILL.**



**IMPORTANT**

If your insurance company sends a check directly to you, rather than HDL, Inc., please sign the back of the check and write "Pay to the Order of HDL, Inc." and forward to the address to the right. Include a copy of your Explanation of Benefits.

> Health Diagnostic Laboratory, Inc.
> Attention:  Billing Department
> 737 N. 5th Street, Suite 103
> Richmond, VA 23219

---

**WILL PATIENTS RECEIVE A BILL FROM HDL, Inc.?**

There are **THREE** instances in which a patient would receive a bill from HDL, Inc.:

1) If HDL, Inc. learns that payment for services was sent directly to the patient and not forwarded to our billing department as requested above.
2) If the patient does not have Medical Insurance or opts for services at the Cash Price.
3) If HDL, Inc. has filed claims with the patient's insurance company and the patient has NOT met the patient contribution requirements (i.e. deductibles, co-pays, etc.) for laboratory services.

**Thank you for trusting HDL, Inc. with an integral part of your healthcare!**

©2010 Health Diagnostic Laboratory, Inc.  |  1.877.4HDLABS (1.877.443.5227)  |  www.myhdl.com                    HDL-161.7

Thank you for considering trusting HDL, Inc. with your laboratory testing. We are excited by the opportunity. Mr. Johnson told me that you were interested in receiving our billing policy explanation directly from HDL, Inc.

We at HDL, Inc. are dedicated to both the physician and patient partnership in order to prevent events. Our goal is to provide quality testing that will help you identify where on the disease continuum that a patient sits and to provide the tools you need to get that patient back to a healthy state. A key component to achieving our goals is patient accessibility. Therefore, we internally control costs, at no sacrifice to quality, and have adopted the billing policy where we do not balance bill the patient for costs not covered by their insurance companies. The out of pocket expense to the patient with insurance is <u>zero</u>.

There are only three instances in which a patient will ever receive a bill from HDL, Inc.:

- If the patient receives a check from their insurance company to cover our services and has not forwarded that check to our billing department (this has never happened to date);
- If the patient does not have medical insurance and opts for services at the cash price;
- If HDL is "In-Network" and the patient has not met their contribution requirements (i.e. co-pays and deductibles) for lab services with their insurance company. These expenses are minimal and typically less than $20.

Please do not hesitate to give me a call with any questions you might have. I can be reached at 804-325-1122, directly or on my mobile at 804-986-3660. Again we greatly appreciate the opportunity and look forward to our partnership.

Best regards,

Tonya Mallory, President and CEO

# PERKINSCOIE

131 South Dearborn Street
Suite 1700
Chicago, IL 60603-5559

T. +1.312.324.8400
F. +1.312.324.9400
PerkinsCoie.com

January 5, 2016

Eric E. Walker
Partner
EWalker@perkinscoie.com
D. +1.312.324.8659
F. +1.312.324.9659

**VIA FEDERAL EXPRESS OVERNIGHT,
FACSIMILE AND EMAIL**

Tyler P. Brown
Hunton & Williams LLP
951 East Byrd Street
Richmond, Virginia 23219
Fax: 804-788-8218
tpbrown@hunton.com

**Re:   CEASE AND DESIST - Health Diagnostic Laboratory Collection Actions**

Dear Tyler:

As you know, we represent True Health Diagnostics, LLC ("True Health").  On September 17, 2015, the United States Bankruptcy Court for the Eastern District of Virginia entered an order approving the sale of substantially all of the assets of Health Diagnostic Laboratory, Inc. ("HDL") to True Health, which sale closed on September 29, 2015.  Pursuant to that sale, True Health acquired substantially all of the assets of HDL, including certain of its accounts receivables and all of its books and records, and uses these assets to operate a diagnostic laboratory business that serves many of the former physicians and patients of HDL.

We have recently learned that the HDL estate has engaged Accelerated Receivables Management, Inc. ("ARM"), without bankruptcy court approval, to initiate aggressive collection actions directly against individual True Health patients for services performed by HDL years ago that were never billed to these patients and previously written off by HDL.  For the reasons explained below, the HDL estate's actions are improper and causing immediate and irreparable harm to True Health's ongoing business relationships with these patients and their physicians.  We therefore demand that you require ARM to **IMMEDIATELY CEASE AND DESIST** from all collections efforts against former patients of HDL.

First, the Bankruptcy Court has not authorized the retention of ARM to pursue any collection action on behalf of the HDL bankruptcy estate, as is required under the Bankruptcy Code.  *See, e.g., In re Metropolitan Hospital,* 119 B.R. 910, 917 (Bankr. E.D. Pa. 1990) (holding that a collection agency was a professional under Section 327(a) because of the specialized skill involved in collecting medical accounts receivables from patients with insurance).  Although the HDL estate has not disclosed the terms of its engagement with ARM, ARM's website reveals that its founder, Fran Landau, "is an attorney with 28 years of litigation experience, nearly all of them representing companies like yours in collections litigation" and further states that ARM employs other attorneys to purse collection actions, including Judi Parent as Litigation Team Lead.

Tyler Brown
January 5, 2016
Page 2

Second, the HDL estate has no legal right to collect any outstanding amounts directly from patients. The HDL billing policy, distributed to physicians and patients, expressly states that it will not bill or seek payment directly from patients except in limited circumstances. These billing policies where sent to physicians as an inducement to do business with HDL. HDL never issued an invoice or a bill to these patients and instead expressly assumed the risk of non-payment. A copy of these HDL billing policies are enclosed with this letter. HDL expressly waived its right to seek any payment from individual patients and the HDL estate is therefore estopped from engaging ARM to pursue collection actions against these patients.

Third, the HDL estate is improperly attempting to collect debts using misappropriated and/or inaccurate information. As part of the sale of substantially all of HDL's assets, True Health acquired the books and records of HDL, including all information relating to HDL billing and accounts receivable. True Health has not provided this information to ARM, nor has it authorized anyone else to do so. Accordingly, neither the HDL estate nor ARM has access to legitimate billing and accounts receivable information to correctly calculate the amounts for these collection actions. Indeed, we have identified numerous inaccuracies in the amounts alleged in the ARM collection notices that have been sent to patients..

Fourth, ARM is actively making misrepresentations regarding True Health and its relationship to HDL as part of its unauthorized collection activities. These representations include statements that ARM is pursuing these collections on behalf of True Health, that True Health is the new name of HDL, directing patient inquiries into these collection actions to True Health and encouraging patients to solicit account information from True Health, among other improper and inaccurate statements. These misrepresentations, made by ARM as an agent of the HDL estate, have severely and irreparably injured True Health's goodwill and relationship with its patients and physicians, and potentially violate the Fair Debt Collection Practices Act, among various other debt collection statutes and regulations.

Fifth, it does not appear that ARM is legally authorized to collect debts in many jurisdictions in which it is pursuing collection actions on behalf of the HDL estate, including Arizona, Arkansas, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, Tennessee, Texas, Utah, West Virginia, Wisconsin, Wyoming and Washington. Contemporaneously with this notice, we have sent a cease and desist notice to ARM demanding that they immediately cease and desist from all collection actions against former HDL patients.

These improper post-petition actions on behalf of the HDL estate are severely interfering with True Health's business relationships with its physicians and patients, impairing the goodwill and going concern value that True Health purchased from the HDL estate as part of the sale, and threatens the viability of True Health's business. Furthermore, these actions could give rise to substantial administrative expense claims against the HDL estate for post-petition breach of

Tyler Brown
January 5, 2016
Page 3

contract, misappropriation and tortious interference with business relationships, among other claims.  We therefore demand that the HDL estate confirm by **no later than 4:00 p.m. Eastern Standard Time on January 7, 2016** that it will cause ARM to immediately cease and desist from any and all collection activities against former HDL patients.  True Health expressly reserves all of its rights to seek legal, equitable and other relief against the HDL estate, ARM, and anyone facilitating or working in connection with the HDL estate and ARM, based on these improper actions.

Please call me at your earliest opportunity to discuss this matter further.

Very truly yours,

Eric E. Walker

EEW:ah

Enclosures

Cc:    H. Slayten Dabney, Jr., Dabney PLLC (via email)
       Richard Kanowitz, Cooley LLP (via email)
       Robert B. Van Arsdale, Office of the United States Trustee (via email)



# Health Diagnostic Laboratory, Inc. (HDL, Inc.) Pricing Overview

- **MEDICARE / MEDICAID**
  - The entire cost of services performed by HDL, Inc. is covered under current Medicare/Medicaid requirements.
- **PPO's, POS & HMO Plans:**
  - HDL, Inc. will accept the amount your insurance company allows for each diagnostic.
  - If it turns out your insurance company does not cover a specific test, HDL, Inc. assumes all the risk.

Below you will find an example of a document that you may receive from your insurance company. This is an explanation of the insurance claim (Explanation of Benefits). IT IS NOT A BILL, so do not send payment when it is received. Read the document carefully as different insurance companies label their documents differently.

**THE BENEFITS SUMMARY OF YOUR CLAIM IS NOT A BILL.**



**IMPORTANT**

If your insurance company sends a check directly to you, rather than HDL, Inc., please sign the back of the check and write "Pay to the Order of HDL, Inc." and forward to the address to the right. Include a copy of your Explanation of Benefits.

> **Health Diagnostic Laboratory, Inc.**
> Attention:  Billing Department
> 737 N. 5th Street, Suite 103
> Richmond, VA 23219

**WILL PATIENTS RECEIVE A BILL FROM HDL, Inc.?**

There are **THREE** instances in which a patient would receive a bill from HDL, Inc.:

1) If HDL, Inc. learns that payment for services was sent directly to the patient and not forwarded to our billing department as requested above.
2) If the patient does not have Medical Insurance or opts for services at the Cash Price.
3) If HDL, Inc. has filed claims with the patient's insurance company and the patient has NOT met the patient contribution requirements (i.e. deductibles, co-pays, etc.) for laboratory services.

**Thank you for trusting HDL, Inc. with an integral part of your healthcare!**

©2010 Health Diagnostic Laboratory, Inc.  |  1.877.4HDLABS (1.877.443.5227)  |  www.myhdl.com                    HDL-161.7

Thank you for considering trusting HDL, Inc. with your laboratory testing. We are excited by the opportunity. Mr. Johnson told me that you were interested in receiving our billing policy explanation directly from HDL, Inc.

We at HDL, Inc. are dedicated to both the physician and patient partnership in order to prevent events. Our goal is to provide quality testing that will help you identify where on the disease continuum that a patient sits and to provide the tools you need to get that patient back to a healthy state. A key component to achieving our goals is patient accessibility. Therefore, we internally control costs, at no sacrifice to quality, and have adopted the billing policy where we do not balance bill the patient for costs not covered by their insurance companies. The out of pocket expense to the patient with insurance is <u>zero</u>.

There are only three instances in which a patient will ever receive a bill from HDL, Inc.:

- If the patient receives a check from their insurance company to cover our services and has not forwarded that check to our billing department (this has never happened to date);
- If the patient does not have medical insurance and opts for services at the cash price;
- If HDL is "In-Network" and the patient has not met their contribution requirements (i.e. co-pays and deductibles) for lab services with their insurance company. These expenses are minimal and typically less than $20.

Please do not hesitate to give me a call with any questions you might have. I can be reached at 804-325-1122, directly or on my mobile at 804-986-3660. Again we greatly appreciate the opportunity and look forward to our partnership.

Best regards,

Tonya Mallory, President and CEO

737 North 5th Street, Suite 103,   Richmond VA   23219   Phone: 804.343.2718  Fax: 804.343.2704

# **<u>EXHIBIT B</u>**

**From:** Walker, Eric E. (Perkins Coie)
**Sent:** Friday, January 15, 2016 4:02 PM
**To:** 'Harbour, Jason'
**Cc:** Brown, Tyler
**Subject:** RE: HDL Collection Efforts

Jason:

In response to your inquiry below for additional information relating to the first batch of receivables consisting of approximately 5,300 accounts, I have attached a spreadsheet that contains the additional information requested.

Can you please provide me with an update on the status of HDL's evaluation of True Health's offer to resolve the patient responsibility collection issues?  We believe our offer, which exceeds the offer the HDL estate previously made to resolve this issue just a few months ago, provides immediate and significant value to the estate, and would likely mitigate further confusion and potential legal action relating these controversial collection actions.

Thank you.

**Eric Walker | Perkins Coie LLP**
PARTNER
131 S. Dearborn Street Suite 1700
Chicago, IL 60603-5559
D. +1.312.324.8659
F. +1.312.324.9659
E. EWalker@perkinscoie.com

**From:** Harbour, Jason [mailto:jharbour@hunton.com]
**Sent:** Monday, January 11, 2016 5:14 PM
**To:** Walker, Eric E. (Perkins Coie)
**Cc:** Brown, Tyler
**Subject:** RE: HDL Collection Efforts

Eric:

Good afternoon.

After looking into this matter further, it appears that there are two batches of receivables the Debtors have asked ARM to pursue at this time. The Debtors have asked that ARM not take further collection steps at this time with respect to a third batch previously sent to ARM.

The first batch was sent to ARM on or about August 10th, and consisted of approximately 5,300 accounts with a total amount owed of approximately $13.7 million. The file sent to ARM does not identify the insurance company, if any, related to these receivables. Rick has asked TH on a number of occasions for additional information about this batch, as current TH employees were involved with providing this batch to ARM. In particular, Rick has asked for full information about each of these receivables, including any related insurance companies, and the search terms used to generate this particular list. Please have TH provide the Debtors with additional information about these accounts.

The second batch sent to ARM consists of approximately 3,476 accounts with a total amount owed of approximately $11.8 million. These accounts are related to BC/BS.

For the accounts in both batches, the Debtors have asked that ARM place collection of an account on hold for 30 days if an obligor informs ARM that the obligor did not receive payment with respect to the amount owed. The Debtors also have asked ARM to take no further action at this time if the obligor proves to ARM that the obligor was not paid by an insurer.

Please let me know if you have any questions or if you would like to discuss.

Best,

Jason

---

**From:** Harbour, Jason
**Sent:** Friday, January 08, 2016 5:52 PM
**To:** Walker, Eric E. (Perkins Coie)
**Cc:** Brown, Tyler
**Subject:** Re: HDL Collection Efforts

Eric:

We are still confirming the facts. We will provide you with an update on Monday.

Best,

Jason

On Jan 8, 2016, at 5:50 PM, Walker, Eric E. (Perkins Coie) <EWalker@perkinscoie.com> wrote:

> Jason:
>
> This email will confirm our conversation this morning where you communicated to me that the HDL bankruptcy estate has instructed ARM, and ARM has agreed, to limit their collections of purported HDL accounts receivables only to Blue Cross Blue Shield patients and only for so-called "paid-to-patient" accounts, i.e., where patients received a check from BCBS but did not pass that payment on to HDL. You further explained to me that if certain BCBS patients who are contacted by ARM did not, in fact, receive a check from BCBS and inform ARM accordingly, ARM will suspend collection efforts for 30 days to provide the patient an opportunity to obtain proof that they did not receive a check from BCBS. If the patient provides such proof, then ARM will cease all collection actions against that patient.
>
> If I have misunderstood our conversation or the current status of collection activity with respect to HDL accounts receivable, please let me know immediately.

Otherwise, we look forward to working with you to reach an agreement that will resolve this issue for good.

Thank you.

**Eric Walker** | **Perkins Coie LLP**
PARTNER
131 S. Dearborn Street Suite 1700
Chicago, IL 60603-5559
D. +1.312.324.8659
F. +1.312.324.9659
E. EWalker@perkinscoie.com

---

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.